Good morning everyone. This is the matter of Ramos v. Attorney General. This is a key rise for Petitioner Erika Oliva-Ramos. I would respectfully like to request to reserve three minutes for rebuttal. Attorney General Barr Okay, maybe you can help me with this. There are a lot of great, valid, and strong points you have. If we get past the issue of consent, at least from my perspective, we haven't discussed this case, at least from my perspective, I cannot get past that issue. Unless I can get past that, you don't even get to whether exclusionary rules should apply to immigration proceedings. It seems to me like it should, and if it ever was going to, this is the kind of case where it should. But how do we get there given Koehler's consent? Attorney General Oliva-Ramos Your Honor, there are at least two ways to respond to this. First and foremost, with regard to the issue of consent, the agency below simply failed to ask the correct question, failed to apply the right legal standard. The agency asked whether or not Clara, Petitioner's sister, said yes to the five armed immigration agents in police uniforms who surrounded her at the door, waving a paper they claimed was a warrant, but which gave them no legal authority to enter. Justice Breyer But even that, given Koehler's, forget how the immigration judge in the Bay analyzed Koehler's affidavit. Just looking at her affidavit, the consent is there. Said, yeah, I let them in. I didn't know I couldn't let them in. I was afraid of what would happen if I refused their admission, which shows that she was anxious and apprehensive as anybody would when folks come knocking at your door at 4.30 in the morning, armed. But that doesn't matter, understandably. You don't have to be told of your right to refuse. So just looking at her affidavit, why doesn't that give you consent? Justice O'Connor Well, Your Honor, consent is not simply verbal acquiescence. The Supreme Court made very clear in Bumper that verbal acquiescence to a mere show of authority is not free and voluntary consent, legally valid consent. Justice Breyer Well, it could be, but you have to go further here. You have to show that there's been an egregious violation of a constitutional right. And it's tough to say here that this was egregious. Maybe it's close to the Supreme Court. I don't know. I don't think it's ever, but — Justice O'Connor Your Honor, what makes this case egregious is not simply the extraction of consent at the door through what is effectively a misleading representation of the paper that they had, which was a deportation order never authorizing legal entry into a home. But when authority is — a show of authority is used to induce consent in that manner. But what makes this case egregious is not simply that consent was extracted in that manner, but the way in which the officers comported themselves once they got inside the apartment. Justice Kagan Let me back up on the consent issue. The government had the burden to prove that it was freely and voluntarily given. Justice O'Connor Yes, Your Honor. Justice Kagan Is that correct? And my understanding is the government produced one witness who actually had no knowledge of what went on in the scene. Is that correct? Justice O'Connor That is correct. She had no independent recollection of what occurred that evening. Justice Kagan So I guess your contention would be that the government didn't meet its burden given Clara's affidavit as to the duress, or if the armed nature, et cetera, et cetera, and the pressure imposed upon her. Justice O'Connor Absolutely not, Your Honor. And the agency did not even require the government to meet that burden. It merely found that she verbally acquiesced and treated that as if it was valid consent. Justice Sotomayor Well, why wouldn't the firm, the I-213, why wouldn't the witness, Bella Duardo, I guess it is, when Bella Duardo looks at the form and says, look, I don't remember what happened here. I go on hundreds of these midnight raids all the time. I don't remember this particular one. But I see I've filled out 213. The regs require that 213 reflect consent where there is consent. She said, I'm looking at form 213, and based upon what's on this signature, I'd have to say, yes, there was consent. Why wouldn't that be sufficient? Justice O'Connor Because a mere statement that consent was obtained by the officers who argue that they obtained it without more is not sufficient to meet their burden to show it was free and voluntary. Justice Sotomayor Why isn't Clara's affidavit more? Justice O'Connor I'm sorry? Justice Sotomayor Why isn't Clara's affidavit more? You say without more. Why isn't her affidavit, Clara's affidavit, why isn't that the more that you are looking for? Justice O'Connor Because the facts in Clara's affidavit, Your Honor, aside from the fact that she said yes, which we do not contest, aside from the mere verbal acquiescence, all of the other facts actually go in our favor and suggest that that yes was not an expression of free and voluntary consent. But if I may, to go to Judge Ambrose's question with respect to whether this is actually egregious, the egregiousness of this case turns not solely on the manner of entry, which we maintain was not valid, but on what transpired inside. Even supposing that consent was legally obtained, as soon as the officers entered the home, they immediately exceeded any bounds of such consent. Consent is, the scope of consent is what a reasonable person would understand from the exchange. They said we have an order to arrest Maria Theresa, and Clara responded to their show of force by saying yes, come in. Justice Sotomayor Consent is the entry, but then you have the issue of seizure. Exactly, Your Honor. And the manner in which the officers comported themselves, immediately conducting an indiscriminate search and seizure, seizing Petitioner from out of his bed at 4.30 in the morning, in his underwear, with an armed guard, ordering him to get out and escort, and standing there until he complied, and rounding up everyone who was there, far exceeded any consensual entry. It was very clearly not a consensual encounter at that point. The government is here arguing that immigration agents who supposedly enter with consent should have authority to behave in a manner that police officers, with a judicial warrant backed by probable cause... What should the officers have done in order to gain control of the inside of the place once they were there? I mean, they can't just say, we're here looking for Maria, could you just check the rooms and see if she's there? No, they have to go from room to room. Well, with due respect, Your Honor, in fact, if it was indeed a consensual entry, that would have been the logical first question to ask, where is Maria Theresa? And actually, the record does not reflect at all, however, that they prioritized that stated objective of entry. They immediately proceeded to conduct a full-scale search of the apartment and to see if they could be looking for her. Yeah, and Judge Ambo's point is that once they're in, they've got to secure the place. So how do they secure the place without physically going from room to room? Your Honor, assuming that such a securing of the place or, if you will, a protective sweep is ever justified upon entry after consent, which is not clear from this circuit's law, and other circuits have rejected the extension of buoy in that manner, but assuming it is ever justified, it is only justified if there is a reasonable suspicion of danger. And here, the government made no showing that there was any reasonable suspicion of danger. And this Court's own decision in Cherar v. Felsing suggests that no information, no idea that there was a danger, is not a ground for a protective sweep. Thus, they had no basis on their facts that are uncontested in the record. The government concedes at page 11 of its brief that none of the relevant facts are indisputable. Where is the brief? Only that section, Your Honor. Okay, okay. The stuff that helps you, you know about. Hopefully the other stuff as well. Okay. But, Your Honor, they've conceded that those facts are undisputed. They had no showing that a protective sweep was warranted. And even if a protective sweep were warranted, it must be limited under buoy. It's clear that it is a quick, visual… Well, they should have gone, is she here? No, goodbye. That's your position. And in order for them to pull everybody out, line them up, question them, there has to be something other than, well, one person who lived here was illegal and she's not here, so I guess we really need to figure out who these other people are. Precisely, Your Honor. Why should they have to rely upon the statement, she's not here? Once they're inside and they're told she's not here, why should they have to accept that? Your Honor, one could argue certainly that if they in fact had an administrative warrant for her arrest, which is not a judicial warrant, they could have searched for her. But then their actions would have been limited to locating her. They had a picture of her. It's quite apparent that from the moment they saw our client lying in bed in his underwear that he was not their target of their operation. But they didn't limit their actions to that. And a protective sweep, if ever justified, or even locating the target of a warrant, does not justify an investigative search, which was in fact what occurred here. They not only detained Petitioner and everyone else they encountered, but they questioned and interrogated them. Don't they have a right to ask him for his identity? No, Your Honor. Under the regulations, they have a right to ask anyone for their identity or immigration status so long as that person is free to leave. In this context, at no moment inside the apartment was Petitioner free to leave or go about his business. That is clear from the uncontested facts. The regulations suggest their own regulations, which were promulgated to ensure compliance with the Fourth Amendment, suggest that if they're going to detain someone for questioning, they have to have reasonable suspicion based on specific, articulable facts before doing so. In this case, the government made no showing whatsoever of any particularized suspicion or articulable facts that would have justified their seizure of Petitioner or anyone else they found. What test of egregiousness? I mean, we're going beyond just plain Fourth Amendment violation. We've got to find egregiousness. Now, granted, this was a home setting, so maybe that would support it, but what's the test you would advocate? Because we have not adopted a test, whereas most of the other courts have. That's correct, Your Honor. We certainly think why this case in particular is egregious is that it strikes at the heart of what the Fourth Amendment protects. But what's the test? Egregious means shocks the conscience, reasonable officer, bad faith, severe. What's the test? Understanding the community sense of fair play. Right. Your Honor, I think a number of these could be instructive. The Ninth Circuit, for example, has adopted a test that is familiar to courts and to officers, that it's when there is either a deliberate or a violation of clearly established law. But that's normal. I mean, that's not egregious. That's kind of a low bar, isn't it, for egregiousness? Arguably, Your Honor. Against clearly established law? I mean, unfortunately, we find that that happens all the time because maybe they're just not aware. But it doesn't mean that the conduct itself, I mean, it's kind of like you know it when you see it. Maybe the shocks the conscience is appropriate. We would certainly think that the circumstances in this case would meet even that standard, Your Honor. But what is dispositive about the egregiousness of this is that the facts of this case are entirely distinguishable from any of the several cases that have come before this court addressing suppression in the immigration context. We're talking about a home at night. None of those concerned a home raid at night. We're talking about armed agents who effectively misrepresented what authority they had to enter. They waved a paper saying it was an order of arrest in police uniforms, knowing full well it didn't give them authority to enter. Abusing authority to extract consent in that manner is certainly an indication, an indicia of egregiousness. The amicus brief cites a lot of pending cases where this type of raid has occurred. Have any of these cases been decided and spoken to the issue of egregiousness? Your Honor, to my knowledge, they haven't directly. Some of the cases have been resolved at the IJ level, and certainly immigration courts have found egregious circumstances. And in fact, but that question certainly goes to another grounds for suppression in this case, which is the widespread nature of these violations. Although we don't have that in the record before us, we would have to say that the IJ was wrong not to have ruled on the subpoenas and take it back for you to make that case. But we don't have that record before us, do we? Well, the record was truncated specifically because of the government's withholding of that information and then subsequent refusal to rule. But those issues, Your Honor, the Petitioner repeatedly sought to put before the agency below, and the agency foreclosed a legal claim that was explicitly acknowledged by the Supreme Court that should evidence. But would you urge that we remand for that purpose, or are you satisfied with the egregiousness test? Your Honor, we would certainly be satisfied with a remand on egregiousness, but we think that there is further reasons why this Court should grant a remand for correct application of the Fourth Amendment and attention to these issues which were not allowed to be presented and developed below. Should this go back? If we think it's egregious, should this go back for determination of reopening, or would we just say that this evidence should be excluded on remand? With due respect, Your Honor, to clarify your question, the evidence regarding widespread violations? No. If we were to say the fruit that all the information about deportability as documentation was the fruit of the poisonous tree, i.e., the egregious violative search, would we say that it could not be considered and send it back, or would we send it back for the IJ at BIA to redetermine the issue on its own? We think that the record supports the finding that these were egregious violations and, therefore, grounds for suppression. But given Ventura and grounds for remand, the misapplication, the failure to apply the law correctly below Fourth Amendment law at all, let alone to reach the issues of egregiousness or the widespread nature, are certainly grounds for remand and correct application of the law and the regulations in the first instance, Your Honor. But in terms of the rule you want us to adopt, which is a pretty impactful rule, we would be on a lot firmer footing if we would remand and have the things that your client tried to put before the BIA, have the BIA consider that entire record of what, at least I personally feel, is incredibly offensive conduct on the part of the agency. Yes, Your Honor. We agree that remanding for fuller consideration of all of these issues and determination in the first instance of these legal issues, applying correct standards, would certainly put this Court, should it face the issue again, in a better position to review on a fuller record. Let me go back to the – at what point was Mr. Oliva-Ramos seized? Mr. Oliva-Ramos was seized when he was ordered out of bed by an armed agent who stood there and commanded him to get out of bed in his underwear at 430 and stood there until he complied. Seizure under Mendenhall and Bostic is very clear. Was he seized or they were just trying to make – secure the situation, and then when did they ask him for his ID and they found out that there was a problem? Thank you for the question, Your Honor. This is precisely the question the agency failed to ask below. They asked him for his ID while he was already seized. He was seized from the moment he was ordered out of his bed by an armed officer, and then he was contained in the living room while the exits were blocked by armed guards and they were yelled at when they didn't respond to questions, couldn't use the bathroom without accompaniment. It was in that context that he was questioned and ordered. He was told to retrieve his identification, and he went to do so escorted by an armed officer. So your position would be – well, I guess your position is he was seized when he was ordered out of bed. But there again, you could say that ordering out of bed to make sure he wasn't, you know, Maria in, you know, costume or something, you know, was fair, or to make sure he didn't have a gun in the bed. But you're saying definitely when they pulled them all in the living room that that was at least a seizure. Certainly, Your Honor. When the armed agent stood there until he complied with the request and then took him into a room where all the exits to the room were blocked by armed guards, that is clearly on the objective circumstances a reasonable person in that context would not feel free to go, let alone the fact it was 4.30 in the morning. So would they have a right to briefly detain him and question him about who he is? Do they not? No, Your Honor. We argue they do not. They did not make any showing of any articulable facts or reasonable basis. An officer can walk up to you in the street and ask you who your identity is. Certainly, Your Honor. But we're in his home at 4.30 in the morning. So I think that is the dispositive difference. It's the free-to-leave aspect, is it not? Yes, Your Honor. And in this context, free-to-leave, even if we interpret Bostic, when people are in a confined space and here he was in his apartment, even if the test is not free-to-leave, it's free to refuse or go about one's business. Clearly, a man who feels the need to ask for permission to get dressed in his own bedroom doesn't feel free to ignore the commands of the officer in front of him. I see that my time is up, Your Honor. I'm sorry. Did we reserve time for rebuttal? I did. Okay, thank you. Thank you, Your Honor. Good morning, Your Honors. My name is Alan Hausman. I'm an attorney with the Office of Immigration Litigation. I'm here representing the Respondent Attorney General. So let me ask this. Can you ever imagine a situation where there would be such an egregious pattern of conduct on the part of the immigration agencies that the exclusionary rule should be applied? Are you saying that just it could never categorically be applied or this is not such an egregious set of circumstances to justify its application? This is certainly not a circumstance to justify that, but I have to look to – this is an administrative record case, and I have to look to what the Board of Immigration Appeals said, which is that under the current state of law from the Supreme Court, a Fourth Amendment suppression is not available in immigration court proceedings. Well, the court really didn't say that. In Mendoza, Lopez-Mendoza, they left it open, and Justice White and Justice Brennan make it very, very clear that as long as the Fourth Amendment is there and as long as the exclusionary rule is there, there's no reason that it ought not to apply in the civil context. And we have barley where we specifically said that, citing to Lopez-Mendoza, and that in an appropriate case, that the exclusionary rule may well apply in the context of immigration proceedings. And Justice Kennedy in a later case said, and if it's in the home, I have no doubt that it would apply. I don't agree with what Your Honor is saying, but I point out looking at the case law from this – Well, if two or three of us read it one way, the fact you may not agree with this doesn't change the result. I understand that, Your Honor, but I'm trying to point out that the Supreme Court had before it – was called upon to decide a legal issue on a specific record. The board had a similar record to what the Supreme Court had in this court. Well, but this was not a factory. This was someone's home at 4.30 in the morning. This is different from what the Supreme Court had. I understand, Your Honor, but the Supreme Court's decision saying that the Fourth Amendment was not available was in the context of circumstances that are not egregious. Can you show me where in the opinion the court said that? Categorically? Categorically said the Fourth Amendment is not available in immigration? Well, what the court in Lopez-Mendoza said was it evaluated – it weighed up the social cost, the social benefit of having the Fourth Amendment available, and in the context of those circumstances said the costs were greater than the benefit. But it said unless it's egregious or widespread, didn't it? Well, it had a set of facts before it that were not egregious, and before this court we have a set of facts that are not egregious. What would make this egregious? The board hasn't set forth a standard, and the circuits haven't agreed. I'm just asking you. We've got armed guards running up a staircase at 4.30 in the morning, pulling people into a living room, pulling them out of their beds, taking them in a van, taking them into a room with a toilet in the middle and questioning them. Is this just a plain old unlawful search? I'm not even conceding that it's an unlawful search, Your Honor. But certainly the facts in this case are not egregious. I've read that this – Well, the government didn't put forth much. We don't even have testimony of someone who says they were on the scene and know what happened. So the Attorney General didn't put forth any evidence to counter the affidavits, did he? The Attorney General, the Immigration Service, called Officer Belluardo. The I-213 shows that she was part of the team that participated in that operation, although the petitioner doesn't recall seeing her there, and she can't recall the specifics of that particular raid. Right. She can't recall being there. But she testified that she was a participant in that operation. Just because it says so, not because she has any recollection. But she does so many of these raids. But she completed. She is the officer who completed the report of that raid. What does participant mean? What if she had just driven them in the van to the place and the other officers go upstairs? She would have been a participant. That's correct. And what she testified to was that she could not remember that specific operation, but that it was consistent with operations that she had participated in, and she described the procedure that followed. And the testimony that – the testimony and the other evidence presented by the petitioner is consistent with her testimony. The immigration judge found there wasn't a factual dispute about what happened that night. Let's just go back. The question is – and we're asking you for help, and you're not answering. What would be an example of an egregious situation, in your view, and contrast it with what happened here? There have been a number of cases in which immigration judges have granted motions to suppress, and the facts in some of those cases involved no basis for going to a home, save for the officers looking for individuals, battering down the door, entering without obtaining consent, the display of a firearm. What if there's no basis to remain in the home once you get there? I'm sorry, Your Honor. What if there's no basis to remain there once you get there? Once you're in there. Is that worse? They found out Maria's not there. Oh, well, the basis – all of the activities that took place, about which the petitioner complains, were incidental to the way in which law enforcement officers conduct an operation for the safety of themselves and for the participants. There came a point where they determined she was not there. That's correct, Your Honor. Now, under the Fourth Amendment, do they have a right to pull everyone out into the living room with and to block the exits and to then question them? Do they have the right to do that? They have the right, Your Honor, to create a secure environment upon their entry. But the secure environment was secure, and why should they not have been required as a matter of law to leave? Because once they were inside, they conducted activities of gathering people together and looking at each of the rooms to make sure that the people were safe and the officers were safe. There is no testimony to that effect. They went beyond that. The problem here is, and maybe you can sense Judge Verdell's frustration, same as mine, that there's a difference between securing the area and finding out who's legal and who's not illegal. If someone is in that house and they're armed, it doesn't matter if they're from El Salvador, Lithuania, or Wisconsin, or Arizona. It doesn't matter, but yet they were after, are you from Arizona, are you from El Salvador? That's what they were looking for. They're trying to find out who's legal, who's not legal. It has nothing to do with securing the premises. According to the testimony of the petitioner, the officers asked him to come from the bedroom into the living room where they were gathered together. There was a masculine pronoun there that's important. Who did they ask to come from the bedroom? Every person that they found in the premises. You just said him. They asked him to come from the bedroom. They asked every person in the premises to gather together in the living room. As to this petitioner, they asked him, your word, to come from the bedroom. But the facts show, Your Honor, and his testimony was that the officers went. Am I wrong about that? Did they ask him to come from the bedroom? They asked him as well as other individuals. And Maria? Maria is a him? No, Your Honor. Okay. So they go in. There's this guy in his underwear. They ask him to come to the living room. And no, Maria is not in the bed in her underwear. So why did they ask him for his identity, basically prove you're a citizen? What did that have to do with securing the premises? What it had to do, Officer Belliuardo explained that the way the operation is conducted is that all of the occupants are gathered together in the living room. We know how the operation is conducted. That is exactly her problem. The way the operation is conducted is what may lead to the application of the Fourth Amendment. And, you know, the thing with the guy in his underwear and then asking him to go get his papers, I just can't understand how you're saying that is securing the premises, unless that thing in his underwear is a gun. Well, it could very well be that the thing in the dresser is a gun or some other weapon. And if they leave him behind in that room, Where was he seized? He was seized after he produced his Guatemalan documentation. Wait a minute. The opposing counsel said that he was seized up in the bedroom. He went downstairs, and then they told him he had to produce whatever identification he had. The group gathered together, all the occupants gathered together. Each person was asked to produce identification. So he testified. But they come out of the bedroom, and they're in the living room, and you're saying, and they haven't said a word to him about documents, but you're saying he wasn't seized as of that moment? I'm saying that, Your Honor. How so? Because he wasn't free to leave, was he? Well, Your Honor, he was free to leave, but it really is a moot point if you look at the testimony. You're kidding. I hope you're kidding. No, Your Honor. I am not kidding. I mean, if he just said, you know what, I'm out of here. I'm out of here. Okay. If we look at page 250 of the administrative record, he was asked, did he feel that he was free to leave? And his answer was, I never had intentions to leave. So it's an academic question of whether he was free to leave. He said he had no intention. He did not intend to leave. He was determining whether he was seized. Was he really free to leave? Well, I was asked when was he seized. He was seized after he produced the documentation showing that he was a citizen of Guatemala. The INS officer or the immigration officer at that point had a basis to seize him and to transport him to their office. What about those who were with him who did have identification and were definitively not here illegally? One person had a card showing that she's a lawful permanent resident. That's the petitioner's sister, Clara. And took her to the facility? No, Your Honor. She was the only person who remained behind because every other person that was present sleeping in that house was unable to, through their identification, satisfy the officers that they were both an alien and legally present in the United States. I mean, she is the only person who demonstrated that she was not a United States citizen but was entitled to remain here. And the purpose of seizing those people and transporting them to the immigration office was to ascertain whether they were in the United States legally. The second part of the requirement. The first part is identity and alienage, and then the second part is merely because they're present as an alien doesn't mean that they're illegally present in the United States. And the production of the lawful permanent resident card was proof that she was lawfully in the United States and she remained behind at the apartment when the other individuals were taken for further questioning to the office. Are these raids, if you know, are these raids still being conducted in this manner? I mean, there's a lot of opinions. There's non-published opinions that have said 4.30 in the morning in a home, armed guards. Do you know if they're still being conducted? Well, I know that the Immigration Service continues as their priorities to arrest individuals who are fugitives, which could mean that they are criminals. It could mean that they're individuals who've been through the administrative process and have a final order of removal. Are the raids still being conducted? I think that was the question. I know that they're continuing to arrest people early in the morning. I do not know whether the instructions for how they go about conducting the raid have been changed since 2008. Now, the IJ said that she would rule on the subpoenas, address those motions, and never did. Why should we not remand for the production of documents for then Oliva Ramos to have the opportunity to use those as evidence? Okay. That issue was raised before the board, and the board resolved it by pointing out that the immigration judge had explained that the Freedom of Information Act was available. Generally, the issuance of a subpoena or other discovery before the immigration court is limited to where the evidence is essential. Because it's the nature of the immigration court, as the Supreme Court recognized, it's a streamlined proceeding to determine whether the individual prospectively may continue to remain in the United States. It's a very limited focus, and creating civil discovery and availability of other techniques would divert from the purpose. But in the history of constitutional rights, though, it's a little bit different, isn't it? Well, what the board considered the issue in the context of the Fifth Amendment of constitutional right to due process. And in this particular case, applying the due process standard, there was a failure to demonstrate prejudice. The immigration attorney represented that the government would produce a witness or sufficient witnesses. In this case, it was Officer Belluardo who was a participant. Well, what the government represented apparently was they would produce sufficient witnesses to establish their burden. That's the way I read page 43 of the brief. That's correct. Which is not giving much. We're saying, look, we're going to produce the witnesses. We have to produce the wit. That's what they said. Right. And in this case, it was Officer Belluardo who testified on direct inquest examination as to her understanding or her participation and the procedures that are followed. And she couldn't remember anything. They couldn't remember anything, and they're trying to get witnesses who might have some memory that would be helpful to establishing their position. The amazing thing here is that the petitioner is asked to rely upon the Freedom of Information Act. They're your records. I mean, you've got these records. So you're telling the petitioner, look, you go file a lawsuit against us under the Freedom of Information Act, and maybe you'll get the materials that you need to prevail and win your case, but they're your records. But those arguments were presented to the board in the Fifth Amendment context, in which case, in order to prevail, you have to demonstrate prejudice. And the petitioners failed to demonstrate prejudice of not being able to have subpoenas for the other officers who participated. And so there was no violation of their opportunity to have a full and fair case. Well, if there's a violation of the regulations here, it's clear under Leslie in our law that they wouldn't have to demonstrate prejudice. That goes to whether or not the action should be dismissed. That doesn't go to the Fourth Amendment claim. Well, the Fourth Amendment and the Fifth Amendment in this case merge, and that the board declined to address or declined to analyze the legal issues in this case in the context of the Fourth Amendment relying upon Lopez-Mendoza. Well, maybe that was a problem because, again, I don't read Lopez-Mendoza as broadly as you've argued it. And I've asked you for specific language in Lopez-Mendoza that would support your sweeping reading of it. I haven't heard any yet. I've got the opinion in front of me, along with our reference to it in Bali, and I just don't see it. And I clearly, at the time that Justice White and Justice Brennan wrote their dissents, they weren't interpreting what the majority opinion said quite that broadly. Well, with your permission, Your Honor, the red light is on. I would just suggest that the specific language is what the Court said at the very end of Lopez-Mendoza, which is, it's one sentence, that here is the exclusion of credible evidence gathered in connection with peaceful arrests by INS officers. We hold that the evidence derived by such arrests need not be suppressed in an INS civil deportation hearing. And the ---- And finally, we do not deal here with egregious violations or other liberties that might transgress notions of fundamental fairness and undermine the probative  Well, if ---- I agree, Your Honor. My final sentence is that there is no evidence in this record of an egregious violation. The IG didn't find it. The board didn't find it. But if the Court disagrees ---- They are trying to put the evidence ---- If the Court disagrees, what should we do? You should remand it to the board for it to conduct an analysis under the Fourth Amendment, which it declined to do in this particular case because it didn't believe that the law required that. Let me ask this. Everyone is talking about the balancing test. And the reason for the majority's outcome in Lopez Mendoza is because the social cost of applying the exclusionary rule outweighs the benefits that would be obtained in a civil context. But if they ---- if the record consisted of all of the things that the petitioner is trying to put into it and that's factored in, isn't that part of the social cost? If you have an agency which is kind of out of control, which is running around conducting dragnet kinds of sweeps, which is the kind of evidence they're trying to I mean, do we want to have a situation where an agency of the government responsible for upholding the Constitution that it swore to defend is out there running around conducting these runaway sweeps, rounding up everyone inside a home at 4 o'clock in the morning, not to secure the premises, but to find out whether or not they're here illegally? That's part of the social cost that has to be factored into the balance, isn't it? I agree completely, Your Honor. And my response is that this Court has addressed that situation in the Argueta, or at least when I say the situation, that context in Argueta v. Ice, 643 F. 3rd at 60. It's a Bivens case involving precisely the same enforcement activity as involved in this case. Now, I would presume that as a Bivens ---- well, that if that were brought as a class action, the petitioner here would be a member of the class. Since he was arrested in New Jersey during the period of time, that the specific activity that Argueta deals with was in effect. I mean, you know, it talks about the Argueta case, talks about the circumstances, and this case falls within that context as well. And in Argueta, the Court ---- Is Argueta in your brief? It's in the 28J that I served, Your Honor. Right. In the Argueta case, the Court found that the district court erred in not dismissing out the senior officials at the Justice Department and Department of Homeland Security because there was a failure to show a clear constitutional violation. Presumably, the case has continued with respect to the individually named defendants. But it didn't reach the constitutionality of the searches. No, no, it didn't, Your Honor. But the case is useful. It informs the judgment here because it deals with the very same activities that we have been talking about today. And it describes them, and the Court analyzes those circumstances. But, Your Honor, during my almost 30 years at the Justice Department, I have tried to lead counsel for the government in class actions in district courts involving the similar kinds of claims, not necessarily the same facts, the same operations. Well, facts are pretty important. But similar kinds of claims. Facts are pretty important. I think the facts in this case are essential because the key is whether there have been egregious violations. And if there was consent, if the officers acted properly in asking people to identify themselves, if the Court reads the testimony of the petitioner and looks at Clara's his sister's statement, you will see that there is no disagreement over the facts about what happened. The disagreement between the litigants here is what the legal significance of those are. But the circuit, the law in the circuit is that when officers go out with a warrant of arrest from the immigration judge, the immigration judge has held a hearing, that process has been completed. The alien is found removable from the United States. A warrant of arrest is issued directing any immigration officer to arrest this particular individual. So when the officers went to that home, it wasn't on a law. We understand your argument now. We're going to be asking the same question. Thank you, Your Honor. Thank you, Mr. Huffman. All right. Mr. Huffman, before you get to your planned rebuttal, let me ask you this. If you win, then so what? The identity cannot be suppressed. I think we all agree on that. His identity has not been revealed to the immigration authorities. They know he's here illegally. They're not asking for damages or declaratory judgment unless I miss something. So what do you win by applying the exclusionary rule here? Well, Your Honor, with due respect, I'd just like to address one first point you made. The issue of the suppression of identity, what we're requesting in this case is suppression of information regarding alienage, not the body or identity, and not a preexisting A file. In U.S. v. Boley, the issue you addressed there was not only an illegal reentry case, which this is not, but it concerned a preexisting immigration file. Here, the only information subject to suppression is information that was illegally obtained through unlawful search and seizure. But the information in the file in Boley was obtained pursuant to an illegal inquiry. In fact, the file was accessed pursuant to an illegal inquiry, but the information that the government actually put forward was the old deportation order, which was retrieved from the preexisting immigration file. That was the matter. So the issue is what do you get? Well, in fact, Your Honor, if this case were to be remanded, we would certainly pursue any and all forms of relief, of which there are several. Well, give me one. Prosecutorial discretion exists and potentially cancellation from removal. And, Your Honor, upon remand, we're certainly not suggesting, if this information were to be suppressed, that ICE can never pursue our client. The issue is that they can only do so with lawfully obtained evidence and grounds. If I may, Your Honors, I wanted to just address… Lawfully obtained evidence. Isn't that the rabbit in the hat? So let's say we go so far as we did in Leslie and dismiss the removal proceeding. They now know he's here. They may or may not know where he is. They can find him, I'd imagine, pretty easily. Why couldn't they just initiate a new proceeding, rely upon Lopez Mendoza saying, you can't suppress his identity, we know he's here. They could now find out through other means that he's here illegally pretty easily, I would imagine, and he's been moved. Your Honor, we would concede that the immigration officers, if they pursued, lawfully pursued the individual and obtained lawful evidence, lawfully obtained evidence of alienage, should they be able to do so, a decision in this case would not bar that. I did, with your permission, I wanted to address a couple of points raised. First, four points specifically, I will try to do so quickly if I can get to them. You do everything quickly, Ms. Rice. Apologies. I've been born with very quick speed of speech. Apologies. First and foremost, Argueta, Your Honors, this court did not, as Judge Rendell recognized, address the constitutionality of the conduct at issue in Argueta. And specifically, that case was limited solely to liability. It had nothing to do with whether the actions themselves or the conduct was unconstitutional or constitutional. And, in fact, in the course of briefing for that case, the government itself argued that suppression was the appropriate remedy for in-removal proceedings. That's in their own briefing in that case. I believe we addressed it in our 28-day letter. And particularly, they also argued that issues of unlawful search and seizure should be treated under the Fourth Amendment, not due process. The second issue is this issue with incentive. I see my light is on, Your Honors, if I may just address this point. The second issue is the issue of the incentives. The opposing counsel all but concedes they did not have a right to interrogate, detain and interrogate our client or the other residents. They did not have a right to do that. What they had was an incentive, and that's precisely what the information of widespread abuses would reveal. They were operating under a policy with quotas that incentivized them to make arrests that were so-called collateral arrests, not arrests of the individuals named in the warrant, which I should use here. You're saying you have information that would support that in the record? Yes, Your Honor, we sought to introduce the policy that was operating, the fugitive operations policy under which the agents were operating. The percentage of collateral arrests and what that meant in terms of their full detention? Exactly. Fully half of those arrests could be collateral. And to clarify yet again, the government continues in its brief and argumentation to refer to what they had as a warrant. It is not a judicial warrant. It gives no legal authority to enter a residence. And certainly the deprivation of the opportunity to present that information regarding widespread abuses was prejudicial not only because it deprived our client of an entire legal claim why suppression was merited, but because it would have borne directly on the testimony at the hearing, the credibility of the officers and the incentives. You're saying this can be compressed any more than you're compressing it to try to get you to your last point. Oh, thank you very much, Your Honor. And the last point has to do with the discussion regarding whether the testimony that our client provided saying that he didn't think of leaving. First and foremost, it's an objective test about whether someone is free to go. In the circumstances, the record does not support his assent. We don't understand that. And he didn't answer the question. That wasn't the question he was asking. We don't understand the test. So we're going to surprise you, but we actually read some of these Supreme Court cases ourselves rather than relying upon what our law court tells us the court said. I know they don't teach that at NYU, but that's the way it works in the real world. Most certainly. Okay, thanks. Thank you very much, Your Honors. Yeah, Ms. Weiss, you did an incredible job. You are a student? I am. At least you were before you came into the courtroom today. You may or may not be when you get back. You did a really phenomenal job. Did you take the bait in high school? I did not. That's what I was going to say, because you have a style like a debater at times. You have a style like a two-minute drill. Apologies for speaking so quickly. No, that's fine. That's fine. Thank you, Your Honor. You could give Chris Berman a run. No, really, you could. All right. Mr. Osmond, thank you very much. Thank you. Well argued.